1  **_HUNT, GALE, MEERCHAUM, ORDUÑO & HOSSLER_**
   330 W. 24th St. - P.O. Box 2919
2  Yuma, Arizona 85366-2919
   (928) 783-0101 Phone
3  (928) 783-2788 Fax
   attorneys@azyumalaw.com
4
   David J. Hossler- State Bar No. 003203
5  Attorney for Plaintiff

6

7

8                _IN THE UNITED STATES DISTRICT COURT_

9                      _DISTRICT OF ARIZONA_

10

11  John Gaughan, a single man,            Case No.

12              Plaintiff,

13      v.                                 Complaint
                                           (Federal Tort Claims Act
14  The United States of America,           28 U.S.C. §§ 2671 et seq)

            Defendants.
15

16      COMES NOW the Plaintiff, by and through counsel undersigned,

17  and for his Complaint, and hereby alleges and claims as follows:

18      1.   Plaintiff John Gaughan, a single man, is a resident of

19  Yuma County, State of Arizona.  Plaintiff resides at 1402 W. Las

20  Lomas St., Yuma, Arizona.

21      2.   This is an action arising under the Federal Tort Claims

22  Act, 28 U.S.C. §§ 2671 et seq.  This Court is vested with

23  jurisdiction pursuant to 28 U.S.C. § 1346(b).  Plaintiff

24  presently resides within this judicial district, and all acts and

25  omissions set out in this complaint occurred within the judicial

26  district of Yuma County, State of Arizona.

27      3.   Plaintiff John Gaughan is employed as a Supply

28

Technician for Boreal Aviation, Inc., formerly known as Seair Transport Services, Inc., a private contractor for the Laguna Army Airfield, Yuma Proving Grounds, Arizona.  As a supply technician, Mr. Gaughan requests maintenance repair parts and supplies from the government.

4.   In 2007, Mr. Gaughan's Project Manager was William E. Malo.  Mr. Malo resigned from his position as Project Manager some time in 2007.  After Mr. Malo resigned, it is believed an investigation was being conducted into Mr. Malo's activities as Project Manager.

5.   Mr. Gaughan was not aware of the investigation being conducted upon Mr. Malo's activities.  Mr. Gaughan became aware of the investigation on June 10, 2009.  It is further believed that this investigation into Mr. Malo's activities is a continuing process.  Status of the investigation, to date, is unknown.

6.   On or about December 17, 2008, Plaintiff Gaughan received a telephone call at his work station at the Laguna Army Airfield, Yuma Proving Grounds.  The caller identified himself as Federal Bureau of Investigations (F.B.I.) Special Agent Matthew Alexander.  Agent Alexander stated he wanted to ask Mr. Gaughan some questions regarding his former project manager, Bill Malo. Mr. Gaughan agreed, and Agent Alexander asked if he could meet with Mr. Gaughan in person that very afternoon.  Mr. Gaughan informed Agent Alexander he was unable to meet that afternoon as he was having to work at the Marine Corps Air Station Yuma to

fuel aircraft in support of the Desert Talon exercise.  Agent Alexander asked if he could meet with Mr. Gaughan the next afternoon, but again, Mr. Gaughan had work obligations.  However, Mr. Gaughan stated he could meet that morning but Agent Alexander stated he was unavailable.  Mr. Gaughan suggested meeting the following week, but Agent Alexander stated he was going on vacation.  Agent Alexander stated they would meet sometime after the New Year.

7.    Based upon the conversation on December 17, 2008, Mr. Gaughan believed Agent Alexander was going to ask some routine questions about Mr. Malo's job activities.  The conversation at the time was friendly and courteous, and Mr. Gaughan was not concerned about the future questioning session.

8.    Soon after the new year passed, Mr. Gaughan assumed he would be contacted by Agent Alexander in January or February of 2009.  Mr. Gaughan was never contacted.  Because he was not contacted soon after the new year, Mr. Gaughan assumed Agent Alexander was not interested in speaking with Mr. Gaughan anymore.

9.    On or about June 10, 2009 at approximately 4:40 p.m., Plaintiff Gaughan received a call in his work area from Susan Arguelles, a Seair Transport secretary.  Ms. Arguelles instructed Mr. Gaughan to report to the front office.  Ms. Arguelles did not divulge any further information as to why Mr. Gaughan needed to report to the front office.  Mr. Gaughan assumed that either Ms. Arguelles or his boss, John Moskal, wanted to speak to him about

1  routine employment matters, and so he proceeded to the front

2  office as asked.

3      10.   Upon arriving at the front office, Mr. Gaughan noticed

4  Ms. Arguelles was speaking to someone, and assumed she was

5  speaking to his boss, Mr. Moskal.  Once Ms. Arguelles left the

6  office and closed the door, however, Mr. Gaughan was surprised to

7  find a man in Mr. Moskal's office.  The man was not his boss.

8  Ms. Arguelles did not introduce Mr. Gaughan to this man, but she

9  hurriedly left the office and locked the door.  The man soon

10  identified himself as F.B.I. Special Agent Matthew G. Alexander.

11  Immediately, Agent Alexander appeared hostile as he flashed his

12  badge at Mr. Gaughan and did not offer to shake his hand to

13  introduce himself.  Mr. Gaughan immediately began to feel

14  intimidated and threatened by Agent Alexander's demeanor.

15      11.   Agent Alexander motioned for Mr. Gaughan to sit in

16  some pre-arranged chairs located in the office.  The chairs were

17  arranged so they were facing directly toward each other without a

18  table or other object separating them in between.

19      12.   As soon as Plaintiff Gaughan sat down, Agent

20  Alexander stated "you know why I am here, don't you."  Agent

21  Alexander's tone was threatening to Mr. Gaughan because he had

22  never personally met Agent Alexander.  In addition, Mr. Gaughan

23  had completely forgotten about his prior conversation with the

24  Agent, and at that moment, he had no idea as to why Agent

25  Alexander was there.  Agent Alexander never contacted Mr. Gaughan

26  after the new year, nor was Mr. Gaughan previously informed about

27

28                                  -4-

1   any meeting with Agent Alexander.  Mr. Gaughan replied saying he

2   did not know why the Agent was there.  Mr. Gaughan immediately

3   began to feel threatened as if he had done something wrong.

4       13.  Agent Alexander informed Mr. Gaughan that he was

5   investigating Mr. Malo and began asking Mr. Gaughan questions

6   about Mr. Malo's activities.  The first line of questioning

7   concerned Mr. Gaughan's responsibilities as a Supply Technician.

8   During the questioning, Mr. Gaughan became very intimidated by

9   Agent Alexander's demeanor, believing the Agent was purposely not

10  allowing him to properly answer the questions in a clear or

11  detailed manner.  Agent Alexander made Mr. Gaughan feel guilty

12  and frightened for no reason.

13      14.  Agent Alexander then questioned Mr. Gaughan about

14  repair parts.  The Agent first asked if Mr. Gaughan ever turned

15  in repair parts, and Mr. Gaughan answered that he had as it was a

16  part of his duties, and explained the process by which he returns

17  repair parts.  Agent Alexander then asked if Mr. Gaughan was

18  aware that Mr. Malo had bought repair parts from other sources

19  and returned them to YPG for credit.  Mr. Gaughan answered that

20  he was not aware of Mr. Malo's activities.

21      15.  Agent Alexander continued to question Mr. Gaughan

22  about repair parts located in a gray trailer.  Mr. Gaughan had no

23  knowledge about these repair parts and informed the Agent that he

24  did not have a key to access the trailer.  The Agent asked Mr.

25  Gaughan if he had ever seen Mr. Malo with repair parts.  Mr.

26  Gaughan answered that he had not.  It was at this point that

27

28                                  -5-

1   Agent Alexander became more intense and began to ridicule Mr.

2   Gaughan by laughing and making sarcastic statements about Mr.

3   Gaughan's "supposed" lack of knowledge about Mr. Malo's

4   activities.  The Agent said to Mr. Gaughan "you mean, *you never*

5   saw Mr. Malo with repair parts?" The Agent's tone was hostile,

6   and made Mr. Gaughan feel as though he was lying (even though he

7   was not).

8        16.  Agent Alexander continued to intimidate and pressure

9   Mr. Gaughan even more by making comments about how it was a

10   felony to lie to the Agent, and that Mr. Gaughan needed to "say

11   the right thing."  The Agent's questioning escalated to the

12   point that he began to question Mr. Gaughan's truthfulness and

13   asked Mr. Gaughan if he would submit to a lie detector test.

14   Because the "interrogation" was so hostile, and not knowing if he

15   himself was under investigation, Mr. Gaughan declined to submit

16   to a lie detector test despite knowing he had done nothing wrong.

17        17.  The interrogation of Mr. Gaughan ended at approximately

18   5:15 p.m., and Mr. Gaughan realized that he had been forced to

19   stay after-hours for the purposes of this interrogation.  Mr.

20   Gaughan was so intimidated and nervous that he began to believe

21   he had done something wrong and was under investigation as well.

22   Agent Alexander, however, did not tell Mr. Gaughan whether or not

23   he was under investigation, or whether he had any rights

24   regarding this investigation.  However, based upon Agent

25   Alexander's demeanor, hostility and outrageous behavior, Mr.

26   Gaughan believed that he was under investigation.  Mr. Gaughan

27

28                                  -6-

1   was mentally and physically exhausted due to the questioning and

2   asked if the investigation could continue the next day.  The

3   Agent informed Mr. Gaughan he had enough information and would

4   not require another day of questioning.

5       18.  After the interrogation, Mr. Gaughan remained

6   frightened and anxious.  Mr. Gaughan was upset that Agent

7   Alexander did not contact him prior to the purported "meeting",

8   and felt his rights had been violated.  As a result, Mr. Gaughan

9   wrote a letter to the Civil Rights and Civil Liberties Complaints

10  of the Office of the Inspector General.  *See* Exhibit 1 attached

11  hereto and incorporated herein by reference.  Mr. Gaughan was

12  requesting information as to why he had been interrogated, as he

13  feared that he may have done something wrong.  Mr. Gaughan did

14  not receive an immediate response.

15      19.  Since the interrogation, Mr. Gaughan has suffered from

16  a nervous and frightened state of mind and severe emotional

17  distress.  Mr. Gaughan was traumatized by the experience and

18  suffers from anxiety as he was made to feel as if he incriminated

19  himself, even though he was not under investigation and had not

20  done anything wrong.  Mr. Gaughan is constantly on guard at work

21  as he fears other surprise interrogations.

22      20.  Mr. Gaughan now finds it difficult to focus at work as

23  he is constantly in fear of being subjected to another surprise

24  interrogation, or being implicated in the investigation of Mr.

25  Malo.  In addition, Mr. Gaughan has difficulty sleeping at night

26

27

28                                  -7-

1    due to his paranoia and anxiety.  Mr. Gaughan is also suffering

2    from depression as a result of the interrogation.

3         21.  On or about November 19, 2009, Mr. Gaughan received

4    correspondence from the U.S. Department of Justice regarding Mr.

5    Gaughan's complaint filed on August 8, 2009.  *See* Exhibit 2

6    attached hereto and incorporated herein by reference.  The letter

7    addressed Mr. Gaughan's claim about providing false and

8    incriminating information to Agent Alexander.  *See id*.  Receipt

9    of this letter exacerbated Mr. Gaughan's anxiety and paranoia as

10   it remained unknown whether another surprise interrogation would

11   occur.

12        22.  Mr. Gaughan has received treatment from a counselor

13   regarding this interrogation incident.  The counselor recommended

14   breathing exercises, as well as acupuncture treatments and

15   massage therapy to help with the stress and anxiety.  In

16   addition, Mr. Gaughan is receiving treatment from Dr. Ashley

17   Hart, a licensed psychologist specializing in trauma and post

18   traumatic stress disorder, and Dr. Martinez-Celaya, a

19   psychiatrist.

20        23.  The condition from which Plaintiff suffers and the

21   injury thereto was caused by the actions of Agent Alexander due

22   to his outrageous interrogation behavior that terrified Mr.

23   Gaughan, causing him emotional distress.  This emotional distress

24   became even more intense when Mr. Gaughan received the letter

25   from the FBI acknowledging that he provided false and

26   incriminating information to Agent Alexander.  *See id*.  The

27

28                                  -8-

1  emotional distress has manifested itself into physical injuries

2  from which Plaintiff continues to suffer.

3      24.   Prior to the surprise meeting, Agent Alexander

4  contacted Mr. Gaughan and established a feeling of trust.  Mr.

5  Gaughan did not originally fear meeting with the Agent as the

6  Agent informed Mr. Gaughan that he wanted to discuss the

7  circumstances surround Mr. Gaughan's former supervisor, Bill

8  Malo.

9      25.   The surprise meeting on June 10, 2009 left Mr. Gaughan

10  feeling attacked and helpless, as though he was being implicated

11  in the Bill Malo investigation.  Agent Alexander's mannerisms and

12  sarcasm frightened Mr. Gaughan, leaving him feeling anxious and

13  scared.

14      26.   The follow-up letter of November 19, 2009 further

15  exacerbated Mr. Gaughan's anxiety as it suggested Mr. Gaughan may

16  have provided false information.  Mr. Gaughan has since believed

17  he has had to be on-guard as he constantly worries he will be

18  included in the investigation of Bill Malo.

19      27.   The actions of Agent Alexander were extreme and

20  outrageous as this purported "simple investigation" of Mr.

21  Gaughan was more of an interrogation.  Agent Alexander questioned

22  Mr. Gaughan, mocked him and sarcastically laughed at Mr.

23  Gaughan's answers, and his mannerisms caused so much stress for

24  Mr. Gaughan even though he had no involvement with Mr. Malo's

25  alleged illegal activities.  The stress inflicted upon Mr.

26  Gaughan during the interrogation lead Mr. Gaughan to answering

27

28                                    -9-

1  questions without being able to fully explain his answers.  Mr.

2  Gaughan was also without representation.  As a result, Mr.

3  Gaughan felt as though his answers could be misinterpreted,

4  leaving him feeling as though he somehow implicated himself in

5  Bill Malo's activities.

6      28.  After Mr. Gaughan filed a complaint explaining his

7  feelings, Mr. Gaughan received a the letter from the FBI which

8  acknowledged Mr. Gaughan's belief of his "self-incrimination."

9  Even though Defendant FBI knew Mr. Gaughan was simply providing

10  information about Bill Malo and had nothing to do with Malo's

11  alleged illegal activities, the letter regarding this self-

12  incrimination further exacerbated Mr. Gaughan's fears.

13      29.  Defendant Alexander's actions, coupled with Defendant

14  FBI's letter was reckless or intentional, and has thus caused Mr.

15  Gaughan severe emotional distress.

16      30.  On or about June 17, 2010, a claim was filed with the

17  U.S. Department Of Justice, a department of the defendant, United

18  States of America, on behalf of plaintiff, and the claim was

19  deemed denied by the Department's inaction as of December 17,

20  2010.  This suit was duly commenced within six months from the

21  denial of this claim.

22      WHEREFORE, based upon the foregoing, the Plaintiff

23  respectfully requests this Court to grant the following:

24      A.   Damages for the injuries for the amount of $42,000.00;

25      B.   For Plaintiff's attorneys fees and costs in an amount

26           of not less than $10,000.00;

27

28                              -10-

1  C. For damages for pain and suffering for an amount to be

2    determined at trial;

3  D. For such other and further relief as the Court deems

4    just and proper.

5    DATED this 7th day of June, 2011.

6            HUNT, GALE, MEERCHAUM
             ORDUNO & HOSSLER

7

8
             /s/ David J. Hossler

9             DAVID J. HOSSLER
             ATTORNEY FOR PLAINTIFF

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
-11-